UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| MICHAEL CAMPBELL, ) | |
| CONNIE CAMPBELL, and ) | |
| DUANE CAMPBELL, ) | |
|    ) | |
|    Plaintiffs, ) | |
|    ) | |
|    v.    ) | CAUSE NO.: 1:06-CV-334 |
|    ) | |
| SUPERVALU, INC., d/b/a SCOTT'S, ) | |
| f/k/a CUB FOODS, ) | |
|    ) | |
|    Defendant. | |

**OPINION AND ORDER**

**I.  INTRODUCTION**[1]

In 1993, Duane and Connie Campbell bought some ground beef at a Cub Food store that they contend was tainted and made their then five-year old son, Michael, seriously ill.  The Campbells, Duane, Connie, and Michael (now an adult), filed suit nearly thirteen years later against Supervalu, Inc., which operates a chain of food stores called Scott's, blaming it for introducing *E. coli* bacteria into the ground beef during the grinding and packaging process.[2]

As Supervalu points out in its February 28, 2008, Motion for Summary Judgment (Docket # 26), the Campbells have undertaken a difficult task with this lawsuit.  At the outset, it appears to be undisputed that in 1993, Cub Foods was actually owned and operated by Rogers Markets, Inc., a Scott's competitor.  And given the intervening years, it is hardly surprising to

---

[1]Diversity jurisdiction arises under 28 U.S.C. § 1331(a).  Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

[2]The Campbells are precluded from arguing that the beef was tainted at its source and then sold to them by Supervalu.  (*See* March 21, 2007, Op. and Order 4.)

1

learn that Supervalu believes that the Campbells' lawsuit is time-barred.  Finally, Supervalu contends that the Campbells cannot show that the ground beef was tainted or that it caused Michael's illness.  As we shall see, these are insurmountable challenges for the Campbells and Supervalu's motion will be granted.[3]

## II.  FACTUAL AND PROCEDURAL BACKGROUND[4]

On September 22, 1993, Duane and Connie Campbell went grocery shopping at a Rogers Markets' store called Cub Foods, located at 5519 Coldwater Road, Fort Wayne, Indiana, and purchased ground beef and Hamburger Helper.  (Compl. ¶¶ 4, 6; Connie Dep. 8-11; Duane Dep. 8; Disch Aff. ¶ 4.)  The ground beef, located in a meat department case, was in typical packaging and there was nothing unusual about its appearance or odor.  (Connie Dep. 12-13; Duane Dep. 9.)  Upon returning home, the package was placed in the refrigerator.  (Connie Dep. 13-14.)

That evening, Connie browned the ground beef and prepared it with the Hamburger Helper according to the package's directions and served it to Duane and Michael, as well as Michael's aunt, uncle, and Michael's twelve year old cousin, Robert Lechko.  (Connie Dep. 14-16; Duane Dep. 11.)  Apparently no one noticed anything unusual about the food's taste, color, or appearance.  (Duane Dep. 13.)

Michael consumed about a cup of the Hamburger Helper, while other family members ate approximately two cups, and no one ate anything else that evening.  (Connie Dep. 21; Duane

---

[3]Supervalu also filed a Motion to Strike some expert affidavit testimony (Docket # 31), but since summary judgment must be granted even if we consider those opinions, the motion will be DENIED AS MOOT.

[4]For summary judgment purposes, the facts are recited in the light most favorable to the Campbells, the nonmoving party.  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  Insofar as the Campbells do not controvert the facts Supervalu asserted in its "Statement of Facts," those facts "are admitted to exist without controversy" as recited in this section.  *See* N.D. Ind. R. 56.1.

Dep. 10.)  The leftovers were stored in a closed plastic container in the refrigerator, some of which Duane and Connie ate for lunch the next day.  (Connie Dep. 21, 29; Duane Dep. 17-18.)

Michael went to bed and then attended afternoon kindergarten class the following day with no complaints of illness.  (Michael Dep. 11; Connie Dep. 22-23.)  At approximately four o'clock that afternoon, however, Michael told Duane that his stomach hurt and that he did not feel well.  (Connie Dep. 23; Duane Dep. 15.)  Michael then experienced bloody diarrhea and vomiting, and the next day, September 24, 1993, his parents took him to a hospital emergency room.  (Connie Dep. 23-24; Duane Dep. 15.)  Robert also became ill a day or two later, but not as severely; none of the adults who ate the Hamburger Helper became sick.[5]  (Connie Dep. 31-32; Duane Dep. 14-15.)

At the hospital, Michael's kidneys shut down due to Hemolytic Uremic Syndrome, a condition associated with *E. coli* Gastroenteritis.  (Connie Dep. 26; Andreoli Aff. ¶¶ 4-6.)  He was transported to Riley Hospital in Indianapolis, Indiana, and treated there for six weeks.  (Connie Dep. 26-27.)  Michael's treating pediatric nephrologist, Dr. Sharon P. Andreoli, opines that Michael was infected with *E. coli* "from food he consumed within 1-8 days prior to exhibiting initial symptoms of hemorrhagic colitis on September 24, 1993."  (Andreoli Aff. ¶¶ 2, 4, 5, 9.)  She also attributes his complications of acute renal failure, onset of insulin dependent diabetes mellitus, congestive heart failure, and chronic renal failure to the *E. coli*.  (Andreoli Aff. ¶ 10.)

The Campbells retained some frozen leftovers of the Hamburger Helper meal and they

---

[5]The record does not reveal much about the nature and extent of Robert's illness, except that he also went to the hospital for diarrhea and vomiting, where the doctor indicated that "it was just a moderate case of food poisoning" and gave him some medicine.  (Resp. Br. 3; Connie Dep. 31-32.)

turned them over to the Indiana State Department of Health ("ISDOH") for testing. (Connie Dep. 28-30.) The ISDOH conducted two tests – one on the ground beef from the frozen leftovers Connie prepared, and another on a sample of raw ground beef collected from the same Cub Foods store eight days after the Campbells' purchase. (Cronau Aff. for Sample No. 2-186 ¶¶ 3-5; Cronau Aff. for Sample No. 2-185 ¶ 4; Connie Dep. 30.)

The Laboratory Analysis Report for the sample of the frozen leftovers did not reveal the presence of *E. coli*. (Cronau Aff. for Sample No. 2-186, Report of Sample 2-186.) The report explained, however, why the test could be considered inconclusive.

> Sample consisted of 22.5 grams of meat and additives including pasta. . . . Conversations with Dr. Rich Mattner suggest that the test kit may not be valid for mixed samples. The enrichment of the organism may not have been optimized and the preservative system of the added "helper" may interfere with the test. There has been no research done in this area, and the results of the test may be inconclusive, the optim[u]m sample should consist[] of 50 grams of cooked meat and 25 grams of raw meat product.

(Cronau Aff. for Sample No. 2-186, Report of Sample 2-186.) In short, the test did "not determine whether there was or was not [*E. coli*] in the ground beef . . . ." (Cronau Aff. for Sample 2-186 ¶ 8.)

The results of the test on the raw ground beef collected from the Cub Food store revealed no presence of *E. coli,* but because the sample did not come from the same batch sold to the Campbells, it too was inconclusive on the question of whether *E. coli* was present in the ground beef purchased on September 22, 1993. (Cronau Aff. for Sample 2-185 ¶¶ 6, 7; Report of Sample 2-185.)

On March 14, 1994, Rogers Markets, Inc., assigned to Supervalu its leasehold interest in the real estate where the Cub Food store was located. (Disch Aff. ¶¶ 3, 5.) The Campbells filed

4

their three-count complaint against Supervalu in the Allen County Superior Court on September 8, 2006, alleging claims of negligence, product liability, and breach of an implied warranty of fitness.  (Docket # 1.)  The case was removed to this Court on October 5, 2006, based on diversity of citizenship, 28 U.S.C. § 1332(a)(1).  (Docket # 2).

Supervalu offers several reasons why summary judgment should be granted, and we will first turn to its contention that the claims are time-barred.  Next, we will address Supervalu's argument on the merits, which we slightly re-cast: it did not own or operate the Cub Foods store on September 22, 1993, so it owed no duty to the Campbells and were not the cause in fact of Michael's harm, and besides, there is no evidence that the ground beef was defective or that it caused Michael's illness.

In response, the Campbells assert that summary judgment should be denied because: 1) Supervalu subsequently assumed the obligations and liabilities of Rogers Markets through a leasehold assignment and assumption agreement; 2) Supervalu waived its defenses concerning the timeliness of the claims and that, in any event, the Indiana statute of repose does not apply to Michael's "simple tort theory of negligence"; and 3) there is a genuine issue of material fact concerning whether the ground beef was contaminated with *E. coli* and whether it caused Michael's illness.

### III.  STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact.  *Payne*, 337 F.3d at 770.  When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder."  *Id.*  The only task in ruling on a motion for

5

summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770. A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

## IV.  ANALYSIS

We begin with a discussion of an important hurdle that the Campbells fail to overcome – the timeliness of their claims – and then we will turn our attention to the merits.

### A.  The Campbells' Claims Are Time-Barred.

All of the Campbells' claims are barred under the Indiana's statute of repose and the applicable statute of limitations notwithstanding their contention that those defenses were waived, or that they fall outside the reach of the Indiana Product Liability Act.

1.  <u>Michael's Claims Are Barred by the Indiana Product Liability Act's Statute of Repose.</u>

Supervalu argues that all of Michael's claims are barred by the Product Liability Act's statute of repose, Indiana Code § 34-20-3-1, which provides in pertinent part as follows:

> (a) This section applies to all persons regardless of minority or legal disability. Notwithstanding IC 34-11-6-1, this section applies in any product liability action in which the theory of liability is negligence or strict liability in tort.
> (b) Except as provided in section 2 of this chapter, a product liability action must be commenced:

6

>(1) within two (2) years after the cause of action accrues; or (2) within ten (10) years after the delivery of the product to the initial user or consumer.

Ind. Code § 34-20-3-1.

The Campbells' counter-argument is twofold.  First, they contend that Supervalu waived this defense by failing to raise it when it filed a prior motion to dismiss.  (Resp. Br. 6-7.)  Second, they maintain that the statute of repose does not apply to Michael's "simple" negligence claim.[6]  (Resp. Br. 7.)  Instead, they submit that Indiana Code § 34-11-6-1 applies, which provides that a person who is under a legal disability when a cause of action accrues may bring that action within two years after the disability is removed.  (Resp. Br. 8.)  The Campbells argue that Michael brought his claims within two years after reaching the age of majority, and therefore well within the limitations period.  (Resp. Br. 8.)  Notwithstanding this argument, we believe the claims are clearly time-barred.

---

[6]The Campbells' response is limited to the so-called "simple negligence" claim.  (*See* Resp. Br. 8).  Consequently, they have seemingly abandoned any strict liability or warranty claims.  *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 n.2 (7th Cir. 1996) (concluding that plaintiff had abandoned a claim after failing to respond to defendant's arguments concerning that claim in its motion for summary judgment); *see generally Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004) (emphasizing that "summary judgment is the put up or shut up moment in the lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events" (internal quotation marks and citations omitted)).  Nevertheless, in order to complete the record we will briefly address these purported claims.

The strict liability claim is obviously barred by the Products Liability Act's statute of repose; indeed, by its own terms, the statute applies regardless of Michael's minority, and the Campbells brought their claim well past ten years after the ground beef was sold to them.  *See* Ind. Code § 34-20-3-1.

The implied warranty claim fares no better.  Any claims Connie and Duane may have asserted arising under the implied warranty theory are barred by the Uniform Commercial Code's four year statute of limitations.  *See* Ind. Code § 26-1-2-725.  Although Michael's implied warranty claim would not be time-barred because he was under the legal disability of infancy when the cause of action accrued, *see* Ind. Code § 34-11-6-1, he has no UCC claim.  For implied warranties of merchantability and fitness for a particular purpose to arise, there must be a contract for a sale of goods between a buyer and a seller.  *See* Ind. Code § 26-1-2-314 ("[A] warranty that the good shall be merchantable is implied *in a contract for their sale* if the *seller* is a merchant with respect to goods of that kind.") (emphasis added); Ind. Code § 26-1-2-315 ("Where the *seller at the time of contracting* has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is . . . an implied warranty that the goods shall be fit for such purpose.") (emphasis added).  As we observe *infra*, Supervalu was not the seller or the merchant who sold the ground beef to the Campbells.  *See* Ind. Code § 26-1-2-103(1)(d) (defining seller); Ind. Code § 26-1-2-104(1) (defining merchant).  Consequently, as a matter of law there was no warranty from Supervalu to any of the Campbells, and therefore summary judgment should be granted on the implied warranty claim.

7

a.    There was no waiver.

The Campbells argue that under Federal Rule of Civil Procedure 12(g), Supervalu waived its statute of repose defense by failing to include it in its prior motion to dismiss. (Resp. Br. 6.) The argument is unavailing.

To begin, under Rule 12(g), "[A] party that makes a motion under this rule must not make another motion *under this rule* raising a defense or objection that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g) (emphasis added). Rule 12(g), therefore, is limited to Rule 12 motions and does not encompass, or operate to waive, affirmative defenses such as statutes of limitations or repose. *See, e.g., Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, 992 F. Supp. 1218, 1225 (D. Nev. 1998), *aff'd in part, rev'd in part on other grounds*, 216 F.3d 764 (9th Cir. 2000).

Although the Campbells could perhaps argue that these defenses fall under Rule 12(b)(6), *see id.*, there still would be no waiver since the argument that the Plaintiff has failed to state a claim can be raised in any pleading under Rule 7(a), or in a motion for judgment on the pleadings, and even at trial. Fed. R. Civ. P. 12(h)(2).

Finally, contrary to the Campbells' assertion that these defenses were not raised earlier (and therefore waived), the record reflects that Supervalu actually pled them as affirmative defenses in its Answer as required by Federal Rule of Civil Procedure 8(c), which is all it is required to do. (Answer, Affirmative Defenses VII, VIII.) Therefore, Supervalu did not waive these defenses.

8

b. The Indiana Product Liability Act's Statute of Repose Applies.

Michael wishes to characterize his claim as one of "simple negligence" so he falls under the tolling provision of Indiana Code Section 34-11-6-1, at least from the time his cause of action accrued and until his eighteenth birthday; a proposition that would at least make his case, as opposed to Duane and Connie's, timely. On the other hand, of course, a statute of repose cannot be tolled because its very purpose is to provide the manufacturer or seller with closure for potential liability after a specified number of years. *Miller v Honeywell Int'l, Inc.*, No. IP98-1742-C-M/S, 2001 WL 395149, at *6 (S.D. Ind. March 7, 2001) (citing *Dague v. Piper Aircraft Corp.*, 418 N.E.2d 207, 212 (Ind. 1981)). Thus, we are asked to determine if Michael can employ such a simple expedient to side-step Indiana's ten year statute of repose.

To answer the question, we simply note that the Indiana Supreme Court has declared that "[t]he Product Liability Act expressly applies to all product liability actions sounding in tort, including those based upon the theory of negligence, and the legislature clearly intended that no cause of action would exist on any such product liability theory after ten years." *Dague*, 418 N.E.2d at 212.

The accuracy of this observation is even clearer now, given that the Indiana legislature amended the Act in 1995, expressly making it applicable to "all actions brought by a user or consumer against a manufacturer or seller for physical harm caused by a product regardless of the substantive legal theory or theories upon which the action is brought." Indeed, that change moved the Indiana Supreme Court to declare that under Indiana Code § 34-20-3-1(a), "it was 'clear the legislature intended that the Indiana Product Liability Act govern all product liability actions, whether the theory of liability is negligence or strict liability in tort.'" *Stegemoller v.*

9

*ACandS, Inc.*, 767 N.E.2d 974, 975 (Ind. 2002).

Consequently, it is undeniable that the Act "governs all actions that are . . . brought by a user or consumer . . . against a manufacturer or seller . . . and for physical harm caused by a product . . . *regardless of the substantive legal theory or theories upon which the action is brought.*"  See *Ford Motor Co. v. Rushford*, 868 N.E.2d 806, 810 (Ind. 2007) (quoting Ind. Code § 34-20-1-1) (emphasis added).  Thus, the Campbells' attempt to cast Michael's action as one of "simple negligence," and therefore somehow falling outside the reach of the Indiana Product Liability Act, clearly fails.

Consequently, applying the undisputed facts to the operation of the statute, it is clear that the product was "delivered" to the Campbells on September 22, 1993, and because they did not file suit until September 8, 2006, almost thirteen years after the action accrued, their claims fall outside the ten year statute and thus are time-barred as a matter of law.

2.  <u>Duane and Connie's Individual Claims for Loss of Love and Affection, Loss of Income, and Costs and Expenses Related to Michael's Illness Are Also Time-Barred.</u>

"A wrongful act by which a minor child is injured gives rise to two causes of action: one in favor of the injured child for personal injuries, and the other in favor of a parent for loss of services."  *Elkhart Cmty. Schs. v. Yoder*, 696 N.E.2d 409, 416 (Ind. Ct. App. 1998).  "[T]he cause of action to the parent is one for property damage[,]" *id*., and therefore the two-year statute of limitations for injury to personal property applies.  *See* Ind. Code § 34-11-2-4; *see generally State v. Guziar*, 680 N.E.2d 553, 554 (Ind. Ct. App. 1997).  Accordingly, Supervalu argues that the derivative claims of Duane and Connie Campbell accrued at the same time as Michael's, and since they were clearly not operating under any sort of legal disability, their claims were not

10

tolled as a matter of law and thus are time-barred.

Although Duane and Connie concede that Indiana law bars their claims, they nevertheless urge upon us the "strong policy considerations" expressed by the Wisconsin Supreme Court in *Korth v. American Family Insurance Co.*, 340 N.W.2d 494, 497 (Wis. 1983), a case in which the parents were allowed to benefit from a disability statute even though they had no disability. (Resp. Br. 8.)

At the outset, it must be observed that in a case based on diversity jurisdiction, 28 U.S.C. § 1332(a)(1), we are bound to follow Indiana Supreme Court precedent as just another Indiana trial court, *Jean v. Dugan*, 20 F.3d 255, 260-61 (7th Cir. 1994) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)), and consequently, the "policy considerations" as expressed by the judiciary of another state generally offer little weight.

This proposition is particularly true here where Indiana courts have "a practice of barring derivative claims even where the victim's claims are protected by the disability statute." *Hansen v. Bd. of Trs. for Hamilton Se. Sch. Corp.*, 522 F. Supp. 2d 1101, 1105 (S.D. Ind. 2007) (citing *Jordon v. Deery*, 609 N.E.2d 1104, 1108 (Ind. 1993); *Barton-Malow Co., Inc. v. Wilburn*, 547 N.E.2d 1123, 1125-26 (Ind. Ct. App. 1989), *vacated in part, aff'd in relevant part*, 556 N.E.2d 324 (Ind. 1990)).

The reason for the difference between Wisconsin's "policy" expression and the law of the state of Indiana is that "unlike Wisconsin, Indiana does not require that a derivative action be joined with an injured party's cause of action." *Id.* at 1107 (comparing *Korth*, 340 N.W.2d at 494, with *Barton-Malow*, 547 N.E.2d at 1125-26). Accordingly, the Court concludes, as in *Hansen*, that Indiana courts are unlikely to follow the approach taken by Wisconsin to permit

11

parents with derivative claims to benefit from a disability statute.

Therefore, without any tolling, the Court agrees with Supervalu that Duane and Connie's claims are clearly time-barred under Indiana law.

*B. The Campbells' Claims Also Fail Because They Cannot Show That Supervalu Sold Tainted Beef That Caused Michael's Illness.*

As noted earlier, Indiana's Product Liability Act, Indiana Code § 34-20-1-1, governs the Campbells' action against Supervalu regardless of whether their legal theory is one of negligence or strict liability in tort. *See Rushford*, 868 N.E.2d at 810. And under the Act, liability is only imposed upon sellers of defective products that are unreasonably dangerous to a user or consumer. *Id.* (citing *Morgen v. Ford Motor Co.*, 797 N.E.2d 1146, 1148 (Ind. 2003)). Although Supervalu presumably concedes that ground beef tainted with *E. coli* is defective and unreasonably dangerous, *see* 2 Dan B. Dobbs, *The Law of Torts*, § 356 (2001) ("[C]onsumers rightfully expect that food will not be contaminated with foreign matter . . . ."), it does contest the assumption that it was the seller.

For example, if the Campbells are advancing a negligence claim, they must prove: (1) a duty owed by Supervalu to them; (2) a breach of that duty; and (3) an injury to them proximately caused by the breach. *Rushford*, 868 N.E.2d at 810. Supervalu essentially argues that since it was not the seller of the ground beef, it had no legal duty to the Campbells, or said somewhat differently, it was not the cause Michael's illness.

"Under the rubric of strict liability, [the Campbells] must prove that: (1) the product was defective and unreasonably dangerous; (2) the defective condition existed at the time the product left [Supervalu's] control; and (3) the defective condition was the proximate cause of [Michael's] injuries." *Petroleum Helicopters, Inc. v. Rolls-Royce Corp.*, No. 1:05 cv 0410-LJM-

12

WTL, 2007 WL 2249118, at *12 (S.D. Ind. Aug. 2, 2007) (citing *Rushford*, 868 N.E.2d at 810). Once again, Supervalu asserts that the ground beef was never in their "control" so as to impose liability.

Because the Campbells have not shown on this record that Supervalu was either the seller of the ground beef, or that the ground beef was tainted, or for that matter that it caused Michael's injury, we believe that summary judgment must be granted.

1.  <u>Because Supervalu Did Not Sell the Ground Beef, It Owed No Duty to the Campbells, and Its Alleged Negligence Was Not the Cause In Fact of Michael's Harm.</u>

Supervalu argues that it cannot be held liable because it neither owned nor operated the store that sold the ground beef to the Campbells. (Def. Br. 6.) The Campbells maintain, however, that although Supervalu did not own the store at the time, it is still liable because in the Lease Assignment and Assumption Agreement between it and Rogers Markets executed the following year, Supervalu agreed to assume all of Rogers Markets's leasehold obligations, including a presumed obligation between Rogers Markets and its landlord "to maintain the leased premises in a reasonably sanitary condition as a grocery store." (Resp. Br. 5-6.)

The fundamental problem with the Campbells' contention becomes quite obvious when we examine the Assignment attached to the Affidavit of Warren Disch, a Supervalu Vice President, and the only thing in the record that might seemingly support such a proposition. (Resp. Br. 5-6; Disch Aff. ¶ 5.) On its face, the Assignment makes clear that Rogers Markets is only assigning to Supervalu its "estate, right, title and interest as lessee[,]" including any claims that Rogers Markets has against its lessor. (Disch Aff. Ex. A.) This is consistent with the usual understanding of contract law. *Plumb v. Fluid Pump Serv., Inc.*, 124 F.3d 849, 864 (7th Cir.

13

1997) ("[E]lementary contract law provides that upon a valid and unqualified assignment the assignee stands in the shoes of the assignor and assumes the same rights, title and interest possessed by the assignor."). Nothing in the Assignment, or in any provision of contract law cited to us by the Campbells, indicates that Supervalu, by accepting the assignment, thereby assumed as a matter of law any responsibility or liability for pre-existing third party claims against Rogers Markets.

The Campbells contend, of course, that we should assume that one of the tenant obligations undertaken by Supervalu was the maintenance of the leased premises in a "reasonably sanitary condition as a grocery store." From this unsupported proposition, the Campbells argue that any breach by Rogers Markets results in Supervalu becoming liable by and through their subsequent assumption of the lease. (Resp. Br. 5-6.) Of course, the first problem with this argument is that it hinges on the terms of a document, the lease, which is outside the record. We can lay aside that fundamental omission, however, because the Agreement, by its very terms, only imposes obligations upon Supervalu prospectively. More particularly, the Agreement provides: "In consideration of the said assignment, [Supervalu] hereby accepts said assignment and assumes the obligations of [Rogers Markets], as lessee, under the Lease which accrue *subsequent to the effective date* stated below." (Disch Aff. Ex. A (emphasis added).) Indeed, this is consistent with the general understanding of the legal effect of an assignment. *See* 9 Arthur Linton Corbin, *Corbin on Contracts* § 866 (interim ed. 2002). Consequently, as a matter of law, Supervalu is not liable to the Campbells by virtue of the Lease Assignment and Assumption Agreement.

Although the Campbells go on to contend that Supervalu is the "successor corporate

14

owner of the Cub Foods Store[,]" the record does not suggest that to be the case.  For example, there is no indication that Supervalu acquired Rogers Markets and Cub Foods as the result of a stock purchase.  *See Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1233 (Ind. 1994) (stating that where a corporation's stock is sold, all of the liabilities and debts of that corporation remain with that corporation).  In fact, if Supervalu had obtained all the corporate stock of Rogers Markets, there would have been no need for an assignment or assumption agreement in the first place.  Of course, the record does not reflect a corporate asset purchase either, but even then, there is generally no assumption of any debts or liabilities.  *Id*.

Therefore, from a legal perspective, on September 22, 1993, Supervalu had no legal duty to the Campbells as a matter of law.  *See Rushford*, 868 N.E.2d at 810 (listing duty and breach of duty among the elements a plaintiff must prove to prevail in a negligence claim).  "Whether a defendant owes a duty of care to a plaintiff is a question of law for the court to decide."  *Bowman v. Tippmann Enters.*, 868 N.E.2d 1172, 1174 (Ind. Ct. App. 2007) (internal quotation marks and citation omitted).  The analysis of whether a duty should be imposed on an actor involves a balancing of three factors: "the relationship between the parties, the reasonable foreseeability of harm, and public policy concerns."  *Id*.; 21 *Ind. Law Encycl. Negligence* § 3.

More particularly, the record is clear that on September 22, 1993, Rogers Markets was operating the Cub Food store, so Supervalu had no legal relationship to the Campbells arising out of that operation; or to say it somewhat differently, nothing that Supervalu did, or failed to do, was the cause in fact for the alleged introduction of *E. coli* into the store's ground beef. *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 640 n.1 (7th Cir. 2008) (citing 1 Dan B. Dobbs, *The Law of Torts* § 182 (2001)).  With respect to public policy concerns, it is hard to argue on this

15

record (indeed, the Campbells do not argue) that "the interests of the [Campbells] are entitled to legal protection at [Supervalu's] hands against the invasion which has in fact occurred."  W. Page Keeton et al., *Prosser and Keeton on Torts*, § 42 (5th ed. 1984).  So, in sum, Supervalu owed no duty to the Campbells, and as a consequence, the negligence claim fails as a matter of law.  *Denison Parking, Inc. v. Davis*, 861 N.E.2d 1276, 1279 (Ind. Ct. App. 2007).

Quite similarly, in order to make out a claim of strict liability in tort, the Campbells must show that the tainted ground beef was in Supervalu's control when it was sold to them.  *Rushford*, 868 N.E.2d at 810.  For the reasons already outlined, the Campbells have no evidence that would give rise to even a reasonable inference that on or before September 22, 1993, Supervalu had control of either the ground beef or the Cub Food store packaging and grinding equipment.  Consequently, this claim also fails as a matter of law.

    2.    <u>The Campbells Also Cannot Show That the Ground Beef Contained *E. coli* Bacteria.</u>

Supervalu's position is that whether the Campbells are advancing a negligence claim or a claim under the theory of strict liability, their evidence must give rise to at least a reasonable inference that the ground beef actually contained the *E. coli* bacteria.  (Def. Br. 9-10.)  In particular, Supervalu maintains that the Campbells cannot establish the cause of Michael's illness because they lack expert testimony on a question that is clearly beyond the understanding of a layperson.  (Def. Br. 10-12.)  *See, e.g., Porter v. Whitehall Labs, Inc.*, 791 F. Supp. 1335, 1342 (S.D. Ind. 1992), *aff'd* 9 F.3d 607 (7th Cir. 1993).

The Campbells concede the need for expert testimony but contend that it exists in Dr.

16

Andreoli's affidavit.[7]  (Resp. Br. 10-11.)  They further contend that there is enough proof to raise a genuine issue of material fact, at least once we consider Dr. Andreoli's medical opinion, the Campbells' deposition testimony, and the test results conducted on the meat samples.  (Resp. Br. 9-10.)

In particular, the Campbells point to Dr. Andreoli's diagnosis of Hemolytic Uremic Syndrome and her conclusion that Michael's stool sample tested positive for *E. coli*, emphasizing that in Dr. Andreoli's opinion, Michael's symptoms are typical of someone who ingested *E. coli* within the preceding one to eight days.  (Resp. Br. 9-10.)  The Campbells also rely on the fact that both Michael and his cousin Robert shared the same meal and subsequently became ill over the next two days.  (Resp. Br. 9.)  Finally, they argue that because the test results on the ground beef were inconclusive, they cannot be read to mean that the meat Michael consumed was free of *E. coli* bacteria.  (Resp. Br. 10.)

"While [causation] is generally a question of fact, it becomes a question of law where only a single conclusion can be drawn from the facts."  *Hamilton v. Ashton*, 846 N.E.2d 309, 316 (Ind. Ct. App. 2006).  Consequently, evidence that merely establishes a possibility of cause, or which lacks reasonable certainty or probability, is not enough by itself to support a verdict; in short, liability may not be predicated purely upon speculation.  *Daub v. Daub*, 629 N.E.2d 873, 877 (Ind. Ct. App. 1994) (citations omitted); *see also Luphahla v. Marion County Sheriff's Dept.*, 868 N.E.2d 1155, 1157-58 (Ind. Ct. App. 2007); *Topp v. Leffers*, 838 N.E.2d 1027, 1033 (Ind. Ct. App. 2005), *trans. denied*, 855 N.E.2d 998 (2006).

---

[7]Supervalu has filed a motion to strike Dr. Andreoli's and Cronau's affidavits primarily because their testimony was not timely disclosed.  (Docket # 31.)  As previously noted, we do not need to reach that question because the Campbells do not raise a material issue of fact that precludes summary judgment even if the testimony is considered.

At the outset, it is important to note that there is nothing in the record demonstrating that *E. coli* was even present in the ground beef sold to the Campbells, let alone that Supervalu did anything to introduce it into the product.  *See* 21 *Ind. Law Encycl. Negligence* § 89 ("It is essential to recovery in a negligence action that the causal connection between the plaintiff's injury and the defendant's negligence be shown by a preponderance of the evidence."); *Rushford*, 868 N.E.2d at 810 (including proximate causation among the elements of negligence and strict products liability).

At best, the Campbells have established that the ground beef was one possible source, among many others, for the introduction of the *E. coli* bacteria into Michael's body.  Indeed, even Dr. Andreoli does not link the cause of Michael's illness to his ingestion of the ground beef any more than she links it to anything else he presumably consumed in the *eight* days preceeding the onset of his illness.[8]  Thus, although we will allow the testimony of Dr. Andreoli to stand, ultimately it adds nothing to the causation analysis because in effect it is a tautology: the ground beef may or may not have introduced the *E. coli* into Michael's body; and in fact, practically anything he ingested over the previous eight days could have been the culprit.  This purported opinion testimony does not support the Campbells' claim as it does nothing to resolve a fact in issue.  *See* Fed. R. Evid. 702 (providing for the admission of expert testimony when it "will assist the trier of fact to understand the evidence or to determine a fact in issue").

---

[8]There are apparently a variety of other sources for the introduction of *E. coli* into the body, including unpasteurized food products, lettuce, swallowing water in swimming areas such as lakes and pools, contact with animals, and failing to wash hands after using the bathroom and before preparing or eating food.  *See* Department of Health and Human Services, Centers for Disease Control and Prevention, *Escherichia coli*, http://www.cdc.gov/nczved/dfbmd/disease_listing/stec_gi.html (last visited June 17, 2008).  Although the Court does not base its decision on this point, it is worth noting that a number of other possible sources exist for the ingestion of *E. coli*.

Similarly, the Campbells' testimony that both Michael and his cousin became sick after eating the meal does little to show that it was more likely than not that the beef was to blame. After all, four others also consumed the same meal, in fact, more of it, and experienced no such symptoms. Furthermore, Cronau's testimony that the lab tests were inconclusive does nothing to tip the balance in the Campbells' favor and merely underscores the speculative nature of the evidence and the ultimate conclusion, that the true source of the *E. coli* remains unknown.

In sum, to ask a jury to decide whether the beef was the cause of Michael's illness would invite nothing but speculation. *See Daub*, 629 N.E.2d at 877; *see also* 21 *Ind. Law Encycl. Negligence* § 89. And, without a causal link between Michael's illness and the ground beef, the Campbells have no viable claim under any theory. *See Rushford*, 868 N.E.2d at 810. Accordingly, summary judgment must be granted on all the Campbells' claims.

## V.  CONCLUSION

The Court fully understands the intense desire of the Campbell family to learn the truth about what happened to Michael and to hold someone responsible for his ordeal. The Court, however, is bound by law, and on this record, summary judgment must be granted in favor of Supervalu. Accordingly, Supervalu's motion for summary judgment (Docket # 26) is GRANTED. Supervalu's motion to strike is (Docket # 31) is DENIED AS MOOT.

SO ORDERED.

Enter for June 30th, 2008.

S/Roger B. Cosbey
Roger B. Cosbey
United States Magistrate Judge
